# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JASON KUTCHINSKI, as parent and
next friend to H.K., a minor,
    Plaintiff,

v.

FREELAND COMMUNITY
SCHOOL DISTRICT, et al,
    Defendants

_____/

Case No.: 19-13810
Honorable Sean F. Cox

**RESPONSE**

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Attorney for Plaintiff
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

MATTHEW E. GRONDA (P73693)
Counsel for Plaintiff
PO Box 70
St. Charles, MI 48655
(989) 249-0350
matt@matthewgronda.com

O'NEILL, WALLACE & DOYLE, PC
GREGORY W. MAIR (P67465)
Attorney for Defendants
300 St. Andrews Road, Suite 302
Saginaw, Michigan 48638
(989) 790-0960
gregmair@owdpc.com

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# CONCISE STATEMENT OF THE ISSUES PRESENTED

Are Defendants entitled to summary judgment?

# CONTROLLING / APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

## *First Amendment*

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021)

*J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3rd Cir. 2011) (en banc)

*Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205 (3rd Cir. 2011) (en banc)

## *Void for Vagueness*

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)

*Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997)

*Smith v. Mt. Pleasant Pub. Schs.*, 285 F. Supp. 2d 987 (E.D. Mich. 2003)

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

**BRIEF IN SUPPORT**

Throughout our entire existence as a nation, ridicule, by parody, is a long-time protected tradition. One only need to turn on *Saturday Night Live* on any given weekend to see it. This form of speech is nothing new. For example, Justices on the Supreme Court are subject to it. So too are governors.



It even includes religious leaders. See *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (a parody portrayed a national religious leader as having engaged in a "drunken incestuous rendezvous with his mother in an outhouse"). There are even parodies of parodies—

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com



Whether we find such communications distasteful, dumb, or wrong, such are First Amendment protected forms of speech. *Nwanguma v. Trump*, 903 F.3d 604, 612 (6th Cir. 2018). And "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

This case is little different, except in one respect. Here, H.K., a 14-year boy, created a parodic Instagram profile about his public high school science teacher, Steven Schmidt. While no one has seemingly said it, this was obviously done to ridicule, by parody, that which we come to expect about the stereotypical science teacher—being nerdy, dry, and boring.

The problem later peaked when two *other* students (not party to this litigation) made additional posts which went much further. However, H.K. did not write them, condone them, or approve of them. He is not legally responsible for them either. Less than a day after its creation, H.K. deleted the entire profile, but not before the science teacher found out about it. Schmidt never called the police[1] or an attorney—he called his boss, a school principal. She was outraged—not because there was a true or real threat to Schmidt or the school, but because she hated what it said about her staff and how it made her look professionally to the Board of Education. Punishing a minor who just happens to attend a school for his off-campus parodic speech made totally outside the school day violates the First Amendment. Summary judgment in favor of Defendants cannot occur. The motion should be denied.

## FACTS

In the extremely early hours of Saturday, May 11, 2019, H.K., a then-14-year-old minor created, via his private X-Box device, a parodic Instagram

---

[1] Despite later claiming that one of the posts by one of the other boys was a "death threat" against Trey Anderson, a football coach, Schmidt oddly never reached Anderson either. Instead, his first and only communication was to the school principal solely because he was concerned that he "wanted people to know it was not" his profile or his posts. **Exhibit U, Schmidt Dep at 17.** Anderson himself confirmed that he played online video-games with students; others confirmed the 'colorful' language he used with them. See **Exhibit O**.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

profile under a random nonsensical name but with the username of "schmidtmsteven" which loosely corresponds with the name of H.K.'s biology teacher, Steven M. Schmidt, at the Freeland Community School District. The profile included a photograph that had been pulled off another social media website, **Exhibit V, H.K. Dep at 6**, and contained a description of being "biology teacher at Freeland High School; 1 loving wife #lovers married in 2016; father of 2 beautiful twins #blessed and one 1 (sic) girl #growingup." **Exhibit B.** However, H.K. did not add this description. **Exhibit O, p. 10** (H.K. "does not know who added the personal information on the cover page..."). He created the parodic profile as a "joke" having "sort of irony." **Exhibit V, H.K. Dep at 6**. H.K. took specific steps to make the Instagram profile "private" so that only certain friends could access it. *Id.* **at 13.**

Instagram is a photograph and video-sharing social networking service owned by Facebook where users upload photos and videos for private or public sharing, and is extremely popular with teenagers and young adults. See https://about.instagram.com. An Instagram user interacts with other users by following them, being followed by them, commenting, liking, and tagging shared content, and private messaging.

The "schmidtmsteven" profile's first posts (and the only one ever done by H.K.) was a photograph of a gasoline pump nozzle having an embedded

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

hypodermic needle containing a written comment below the photograph saying "Watch out guys, I am concerned for everyone's safety." See **Exhibit B, #006**. A screenshot is to the right. This "Gas Pump Post" is so nonsensically silly that no reasonable person could take its contents seriously, and no one did,



including biology teacher Steven Schmidt. **Exhibit U, Schmidt Dep at 61.** Defendants have not presented a single person who ever thought the Instagram profile in the name of Abdul Rashid was, in fact, Steven Schmidt. *J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 929 (3rd Cir. 2011) (en banc) (the social media "profile, though indisputably vulgar, was so juvenile and nonsensical that no reasonable person could take its content seriously, and the record clearly demonstrates that no one did.").

That same weekend, H.K. shared the Instagram profile with two other boys, K.L. and L.F., who are, during the week, also students at Freeland.

H.K. also shared the username and password with them. K.L. and L.F. then posted additional photographs and comments. Undoubtedly, these posts are far crasser and more insensitive than the plain vanilla Gas Pump Post. H.K. was "a bit surprised by the posts authored by K.L. and L.F." **Exhibit V, H.K. Dep at 9**. However—and is a key detail in this case—H.K. did not post, author, or otherwise authorize, encourage, or approve of any of the posts, comments, or submissions authored by K.L. or L.F. (i.e. everything but the Gas Pump Post), **Exhibit V, H.K. Dep at 24-27**, who later admitted to Principal Smith that they were the sole authors and content posters (see also **Exhibit O**) and not H.K. Under federal law, H.K. is not legally responsible for the posts by K.L. or L.F. 47 U.S.C. § 230(c)(1).

It is further undisputed in this case—

- H.K. used no school computers or equipment to create the Instagram account in question

- H.K. created and operated the Instagram account totally outside of school hours and never while in class or on school grounds during educational instruction.

- H.K. never brought to school a printout of any of the posts/comments, nor did he ever download it on a school computer.

H.K. later deleted the entirety of the profile and all posts at lunchtime on that Monday via his own cellphone. **Exhibit V, H.K. Dep at 10**. This made the profile's total creation-to-grave as only about 48 hours. But deleting the

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

same did not cause the school's principal to simply stop. What seems to have fueled this matter by the school is that Freeland had just been coming off another social media incident and thusly pre-charged Principal Smith to address issues with social media. **Exhibit R, Smith Dep at 11.** She was expressly concerned how she was professionally appearing to members of the Board of Education. **Exhibit C.**

At about 6:00a.m. on Sunday, May 12, 2019, the biology teacher, Steven Schmidt, was informed by a message from a student about the Instagram account. **Exhibit U, Schmidt Dep at 13.** He did not know who had made the profile or the posts, *id.* **at 16, 18**, but decided to email his boss, Principal Traci Smith. I*d.* **at 17**; see also **Exhibit R, Smith Dep at 8-9.** He did not call (or even think to call) the police or an attorney. **Exhibit U, Schmidt Dep at 16-17.** His biggest concern was that he "wanted people to know it was not" his profile or his posts. *Id.* **at 17.** But with a name like "Abdul Rasheed," who would honestly think that? The photos posted in the Instagram profile were copies of publicly available "pics" from Schmidt and his wife's Facebook page. *Id.* **at 20.** By the start of the school day on Monday, Schmidt "had no leads for" Principal Smith. *Id.* **at 23.**

Despite no evidence of student involvement and in the absence of any evidence knowledge of the Instagram profile on campus, **Exhibit R, Smith**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

**Dep at 13,** Principal Smith self-initiated campus action. In her testimony, she confirmed that in her two decades in education, it was common for students to speak about other students in sexual or even violent ways. *Id.* **at 18-19.** Sometimes it is even about teachers too. *Id.* **at 18.** What is new is that the platform involving the communication are no longer on notes being passed the hallway or scribbles on a bathroom stall; it is now on social media. *Id.*

Principal Smith decided to contact Instagram and the local police about the profile and the posts. *Id.* **at 22, 38.** At that point, Principal Smith began summoning students out of their classes (which itself is totally and excessively disruptive) and asking these random students "if they knew anyone who had made this [Instagram] account, anyone who had posted to this account." *Id.* **at 35.** Principal Smith was starting and fueling a gossip fire that had not been started from the profile itself. Principal Smith concluded that *her* actions were not the cause of school's disruptions but rather there were "many classroom disruptions" going on "because these kids [whomever she means] were trying to take out their phones and show[ing] other kids in the classroom what they were seeing, and they were pointing at the teachers, laughing." *Id.* **at 35.** That never happened. As explained below, Principal Smith's assertion is demonstratively false. When asked which classrooms had these alleged disruptions, Principal Smith identified Mrs. Wheatley, Mr.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Schmidt, and Mrs. Howson. When asked to identify cell-phone toting students, she could not identify any.

The undersigned conducted depositions of each of these three identified teachers. Each testified there was no real disruptions, let alone even a substantial one, to their classroom activities or even a single failure to finish the lesson that was planned for that day. American history teacher Carrie Wheatley testified that a single student came to her during Wheatley's "prep" period to report that Ms. Howson, an English teacher, had been crying.[2] **Exhibit S, Wheatley Dep at 11-12.** Wheatley confirmed that while students had made reference to Instagram profile, nothing was discussed during any class period. There was not any disruption or interference with the teaching of classes caused by the Instagram profile or post. *Id.* **at 20.**

English teacher Chelsea Howson was also called to testify. Admittedly, she was quite unhappy with other posts made by L.F. and LK but confirmed that the Gas Pump Post was not inappropriate and never caused the anxiety and embarrassment she alleges to have had as to the other post as part of accessing and reviewing of the Instagram profile. **Exhibit T, Howson Dep**

---

[2] Defendants suggest that Ms. Howson was crying *during* a class. Nothing in the record establishes her emotional reaction about the other posts—i.e. those made by L.F. and K.L.—was during a class period. But even if it was, it was not because of the limited actions of H.K.'s activities.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

**at 29.** Howson testified to having first found out about the profile because her Instagram account names was "tagged" in one of the posts. However, there is no evidence to support her assertion. See **Exhibit B** (no reference to @ her name). However, she had no idea who made the off-school time post or why. When Howson arrived at school on Monday, she began the regularly scheduled teaching activities. For the first four and sixth period of classes, literally nothing happened. **Exhibit T, Howson Dep at 17-21, 35, 38**. However, Howson indicated that during fifth period, that she thought one of the boys involved, L.F., was making mention of the posts to the small assigned group studying Romeo and Juliet. Yet, oddly, Howson never asked L.F. or the group what they were talking about. *Id.* **at 21-22.** Like high school teachers do a million times a year in tens of thousands of classrooms, Howson simply directed the students to get back on task and the students complied. *Id.* **at 22, 35-36, 38.** Outside this, nothing more happened.[3]

Lastly, there was biology teacher Steven Schmidt. Going through his day on Monday, he confirmed that he had no conversation about the profile or its posts with anyone. **Exhibit U, Schmidt Dep at 28**. Breaking down the

---

[3] When Howson later learned that H.K. created the profile and L.F. and K.L. made the "inappropriate" posts, she never spoke to these students about it because she "didn't feel comfortable bringing up the topics that were posted in the Instagram account." **Exhibit T, Howson Dep at 25.**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

seven periods (with one being a prep period), Schmidt testified that during his first hour's independent work time for students, he was approached by "a student or two" asking if he had "heard about this Instagram that was pretending to be me." *Id.* **at 30.** It is unclear if these students were the ones who had been questioned after being pinged by Principal Smith's "radar" (see *infra*) or had learned of the profile independently. Yet, he falsely told them no. *Id.* **at 31.** But then asked the students to sit down, and they compiled. *Id.* **at 31-32**. Nothing more came of it. For the remaining periods, Schmidt confirmed—period by period—that nothing more happened in his classroom that stopped any teaching, prevented the prepared lesson from being completed, or actually disrupted the classes. *Id.* **at 36-43.** Despite trying to waffle on assertions of undefined discussions about the Instagram account, Schmidt was asked—

Counsel:    I mean, let me just give an example, just as a hypothetical. I go to court, I file a motion and I go to court and I have to argue at court, I argue motions against Greg [opposing counsel], for example. Greg and I talk about the weather, we talk about our families, or we might talk about different things beforehand, but we still accomplish what we're there for, even though we're talking about other things that day, right? Drawing on that parallel, was there anything that the students did not get done because they were speaking to each other about the Instagram accounts or the Instagram posts?

Schmidt:    Not that I can remember.

*Id.* **at 49.** In short, no disruption.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Moving back to Principal Smith, she started working with the local police department because, from her view, "there were some inappropriate posts about my staff members on Instagram and I am unable to access where those originated or where those came from, and I needed [the police department's] help in doing so. **Exhibit R, Smith Dep at 40**. Principal Smith then offered "to start trying to figure out what kids may know information." *Id.* at 41.[4] As she explains it, she then "went and visited some classrooms just to try to get the pulse on who might be talking about the posts." *Id.* at 45. Like a bull in a china shop, Principal Smith confirmed—

> I just went and did some walk-throughs in my building, and once I felt like I had an idea of some kids who might be talking about it based on how they were acting in the classroom, I just started calling kids out of class and talking to them about these posts and the fact that they'd seen or knew anything about them.

*Id.* at 45. Skeptical of Principal Smith's "feeling radar," the undersigned asked "when you were doing your walk-around, what would give you the indication that [the students] were talking about this particular Instagram account?" *Id.* at 45. Smith answered—

> Well, nothing would give me that indication other than these kids were laughing and giggling at, I would say, inappropriate times. Like for instance if the teacher's lecturing and there are two kids maybe sitting

---

[4] Principal Smith had no evidence of any ongoing material or substantial disruption. Logically, she cannot self-manufacture school-day chaos (i.e. yanking random students out of class) and then claim the existence of a disruption by her own making.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

next to each other kind of giggling and laughing, pointing back and forth, those kinds of things, that would be the behavior I was looking for.

*Id.* **at 45-46**. High school kids laughing and giggling—really? When asked which classrooms had these "laughing and giggling" students, Principal Smith could not remember.

At some point, Principal Smith learns from a particular student, L**** E***, that H.K., L.F., and K.L. where the ones somehow involved and she called them to her office for questioning with their parents. In her narrative about this meeting with H.K., Principal Smith misrepresents details and facts. The reason is clear—she was mad about her staff being the object of off-campus ridicule. As one example of many, Principal Smith asserted that H.K. "was initially uncooperative and denied knowing anything about the posts other than what he had heard students talking about in school." **Exhibit F**. This is blatantly untrue. **Exhibit V, H.K. Dep at 20**; see also **Exhibit W, Kutchinski Dep at 51-52.** There are several more, including that the threat of a search warrant by the police to his own home somehow changed H.K.'s story. It was all a purposeful false slant on the real facts to try to boost support for what Principal Smith wanted—expulsion. Nevertheless, the base true facts are there—

- An Instagram account was created using the name "Abdul Rasheed"

- H.K. shared the log-in information to two others students

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

- H.K. made the Gas Pump Post

- The other two students the ones who posted the other photos and comments to the site.

- H.K. did not know the other boys were going to make posts they did.

**Exhibit F.** Needless-to-say and despite embellishments and downright falsehoods, the key take away is that Principal Smith recommended permanent expulsion and an immediate five-day suspension was issued for the disfavored off-campus speech. **Exhibit I; Exhibit C.**

On following day, Superintendent Cairy reveals he was involved with Principal Smith's activities. In an email to Board of Education members, Superintendent Cairy stated—

> three (3) 9th grade boys created a fake Instagram account and posted several awful post defaming Mr. Schmidt (9th grade science teacher), Ms. Howson (9th grade Engilsh (sic) teacher), and Mr. Anderson (coach and substitute teacher). The posts were disturbing, mean, sexual, and threatening. <u>We</u> are considering discipline up to expulsion for these acts.

**Exhibit C.** Superintendent Cairy later makes good on "their" threat and sought to expel a student who solely undertook First Amendment protected speech. **Exhibit G.**

Plaintiff, as H.K.'s dad, retained the undersigned counsel to assist in the defense against the false allegations made towards H.K. and to conduct a real investigation. Immediately, Plaintiff, by counsel, was forced to sue the

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Tittabawassee Township Police Department when access to the Instagram IP records were not provided via Michigan's public records law. **Exhibit J.** It resulted in a disclosure of the records which confirms that what H.K. has been stating all along. **Exhibit K.** Tellingly, throughout the investigation, Superintendent Cairy sought to immediately hold the expulsion hearing without all the facts and evidence having be collected. **Exhibit L.** Plaintiff refused to be hamstrung.

Following the completion of the investigation, Plaintiff's counsel wrote to Superintendent Cairy on July 1, 2019 that the hearing could proceed and directed to have Principal Smith to be present for what was going to be strong cross-examination. **Exhibit M.** Also with the letter was a copy of and reference to the en banc Third Circuit decision in *Blue Mountain* which reversed a school's determination that a suspension was an appropriate punishment for a student who created a fake MySpace account that made fun of her middle school principal because such as protected First Amendment speech. *Id.* Yet, despite the clear teaching of *Blue Mountain*, Superintendent Cairy 1.) failed to halt the expulsion hearing against H.K. and 2.) failed to withdraw the suspension from H.K.'s school record.

On August 7, 2019, H.K., his parents, and their attorney appeared before Superintendent Cairy to conduct the expulsion hearing. Likely

realizing the massive legal problems now facing the school district and its officials for violating the First Amendment rights of H.K., Superintendent Cairy inquired if a formal hearing was even required. From Superintendent Cairy's viewpoint, a hearing was not required due to existence of specific undisputed facts which solely consisted of the following—

    a.    H.K. created the Instagram account;

    b.    H.K. shared the password with his friends; and

    c.    H.K. posted the Gas Pump Post. [5]

**Exhibit N.** H.K. does not contest these _facts_ but rejects that such sufficiently or legally forms the basis for punishable conduct by school officials for speech that occurred off school grounds and outside school hours that did not cause any substantial disruption to classroom activities. Based on these limited stipulated facts for purposes of that hearing, Superintendent Cairy self-concluded that H.K. violated Rule 10 of the _General Rules and Recommendations_ (gross misbehavior) for the following actions on May 11-13, 2019:

    a.  posting of a fake Instagram account;

    b.  impersonating a teacher under an assumed name;

---

[5] As noted, the only post that served as the basis for this finding was the Gas Pump Post. And even if there was a direct rule against parodic speech, the rule itself would be unconstitutional under the First Amendment.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

    c.  posting[6] to that account as a teacher; and

    d.  sharing the Instagram username and password with others.

*Id.* Yet, none of these actions occurred during school hours or on school grounds and Superintendent Cairy did not make such a finding[7] or take the same into account despite being informed of the same by the July 1, 2019 letter. None of the actions that served as the basis for the Superintendent's conclusion actually caused a "substantial" disruption to the school, and Superintendent Cairy did not make such a finding. All other disciplinary charges were dismissed. *Id.* A 10-day suspension punishment was imposed in lieu the requested expulsion sought by Principal Smith for H.K.'s exercise of speech protected under the First Amendment.[8] *Id.*

       This lawsuit then followed. Following discovery and then a stay to wait the outcome of *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021), Defendants have now moved for summary judgment. This opposition now follows.

## STANDARD OF REVIEW

       For Defendants to be entitled to summary judgment, they must meet

---

[6] See Footnote 5.

[7] In the context of student expulsion process, the superintendent acts as the final decisionmaker instead of the Board of Education.

[8] H.K. has never been convicted of any crime related to these events and any possible charges related thereto have been disclaimed by the local prosecuting authority.

two requirements—1.) there be no genuine dispute as to any material fact; and 2.) be entitled to judgment as a matter of law. FRCP 56(a). Here, there are some factual differences largely because Defendants failed to brief a sufficiently clear set of facts for these factually-intensive circumstances. However, Defendants have clearly failed to show that they are entitled to judgment as a matter of law. As such, summary judgment must be denied.

## COUNTER-ARGUMENT

### *First Amendment*

To start, minor-citizens are entitled to First Amendment protections. *Mahanoy*, 141 S. Ct. at 2044. And every law student has been taught the famous line that students do not shed their constitutional rights to freedom of speech or expression "at the school house gate." *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506 (1969). There have been three specific categories of student speech that schools may regulate in certain circumstances: (1) "indecent," "lewd," or "vulgar" speech *uttered during a school assembly on school grounds*,[9] (2) speech, uttered *during a class trip*, that promotes "illegal drug use," and (3) speech that others may reasonably perceive as "*bearing the imprimatur of the school*," such as that

---

[9] As the Third Circuit sitting en banc explained, a school's ability to regulate (i.e. punish) "lewd, vulgar, and offensive" speech "does not apply to off-campus speech… during non-school hours." *Blue Mountain*, 650 F.3d at 932.

appearing in a school-sponsored newspaper. *Mahanoy*, 141 S. Ct. at 2045. This case is none of these. Instead, this case involves speech that occurred completely off-campus and outside any school hours.

The Supreme Court in *Mahanoy* was recently presented with the question of how far can school officials—who are government officials granted more leeway to regulate and punish speech of public-school students—reach into the private lives of students, and punish speech it deems undesirable. In *Mahanoy,* a high school student was ejected from the cheerleading squad and she made two social media posts while off-campus. As explained by the Supreme Court—

> The first image B.L. posted showed B.L. and a friend with middle fingers raised; it bore the caption: "Fuck school fuck softball fuck cheer fuck everything." The second image was blank but for a caption, which read: "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" The caption also contained an upside-down smileyface emoji.

*Mahanoy*, 141 S. Ct. at 2043. School administers were none too happy with this affront and suspended B.L. from the junior varsity cheerleading squad for the upcoming year. She later sued.

The Supreme Court sided with B.L. but an exact test was not articulated. Instead, it pointed out three "features" for "off-campus speech" cases. First, a school or its officials, in relation to off-campus speech, will rarely stand in *loco parentis*. Second, courts must be "more skeptical of a

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

school's efforts to regulate off-campus speech." And third, the "school itself has an interest in *protecting*"—not punishing—"a student's unpopular expression." *Id.* at 2046. "Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is <u>diminished</u>." *Id.* The Supreme Court punted, however, leaving future cases to decide where, when, and how exactly these features are to be considered and applied.

Since *Mahoney*, lower courts have taken the Supreme Court's recent decision to mean there are now "*four* categories of student speech that schools may constitutionally regulate"—the three from above which are on-campus or school-related activities, or off-campus speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others" Defendants do not even try to get within the first three. That leaves only the materially-disrupts/substantial-disorder category. From Plaintiff's viewpoint, asserting that one is within a special category or exemption to the First Amendment is (or is akin to) an affirmative defense—with the burden on Defendants. *Blue Mountain,* 650 F.3d at 928 (the burden is on school authorities to meet abridgement of students' First Amendment rights).

Here, the Supreme Court was clear. A school's claim of materially-disrupts/substantial-disorder must 1.) be viewed skeptically when it

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

originates from speech off-campus and 2.) meet a "demanding" standard—the disruption must be "material" or the disorder or invasion of the rights of others is "substantial." Discussions of "5 to 10 minutes" in classes "for just a couple of days" or that some school attendees (like students) were upset fails to meet this "demanding standard." *Mahanoy*, 141 S. Ct. at 2048; see also *Blue Mountain*, 650 F.3d at 929 (general rumblings, a few minutes of talking in class, and some officials rearranging their schedules in dealing with the speech is not a sufficient disruption).

There was not a sufficient disruption here. Even crediting the short interactions asserted by the teachers, if accepted, is not enough to *materially* disrupt or be a *substantial* disorder. And what cannot be missed is that H.K. only did two things. Off-campus and unrelated to school, he first created an Instagram profile under the name of "Abdul Rashid" with the username of "schmidtmsteven" and used a photo from another Facebook page; and 2.) made the nonsensically silly Gas Pump Post. That is all. And with those acts, it was wholly inappropriate to punish H.K. for his private off-campus speech.

Is his speech that of the highest order? Of course not. But the First Amendment protects "the superfluous in order to preserve the necessary." *Mahanoy*, 141 S. Ct. at 2048 (citations omitted). It also prevents government officials from using *their* subjective judgment to determine the importance or

dislike of private speech and prevents the misuse of _their_ public powers to quash disfavored speech. E.g. _Nwanguma_, 903 F.3d at 612. And if Mr. Schmidt thought he was, in fact, defamed, he already has a legal remedy— a Michigan defamation lawsuit. See M.C.L. § 600.2911.

In short, Principal Smith, Mr. Schmidt, and Mrs. Howson expressly disclaimed that it found the silly Gas Pump Post to be inappropriate. **Exhibit R, Smith Dep at 27** ("I don't really see anything necessarily inappropriate about it."); **Exhibit U, Schmidt Dep at 61; Exhibit T, Howson Dep at 29.** What Defendants' counsel slyly attempts to do is punish _H.K._ for the social media posts made solely _by L.F. and K.L._ which offended the sensibilities of school officials and teachers. They cannot do this. Under the _Stored Communications Act_, Congress has expressly directed that this sort of imputed responsibility is improper. "No provider _or user_[10] of an interactive computer service[11] shall be treated as the publisher or speaker of any information provided by another information content provider."[12] 47 U.S.C. §

---

[10] Defendants failed to recount the "or user" provision of the statute.

[11] Instagram is clearly an "interactive computer service" as an "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).

[12] An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

230(c)(1). As a user, H.K. is not responsible for any of the information (i.e. posts) made by another, i.e. L.F. or K.L.

As a final note, this Court should also look to the en banc decision in *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205 (3rd Cir. 2011) as instructive. There, a minor—while complete off-campus and non-school hours, created a fake internet profile of his principal who found the spoof degrading, demeaning, demoralizing, and shocking. Like here, the parents punished the minor but that was not enough for the angered school administrators. He was found "guilty" of a slew of student code charges including "gross misbehavior." After considering expelling him, the minor was given a ten-day, out-of-school suspension, place in alternative education, banned from all extracurricular activities, and not being allowed to participate in his graduation ceremony.

On these eerily similar facts, the District Court found in favor of the minor and the en banc panel affirmed. The District Court found an insufficient "nexus" between the off-campus speech and any substantial disruption of the school environment. The en banc panel confirmed that—

> an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities.

The school, in turn, tried to argue that it should be able to punish speech that

occurred online. However, there is a recognized critical difference—only that internet speech that caused a "substantial disruption of the school" could be regulated. And because that nexus was missing here (as it is here), punishing such speech—even if vulgar, crude, and demeaning—is a violation of the First Amendment. Plaintiff concurs.

In summary, H.K. has established First Amendment rights while he is off-campus. And only when a school district and its officials prove that the speech undertaken "*materially* disrupts classwork or involves *substantial* disorder or invasion of the rights of others" may they punish a public-school student's speech simply because he attends school at a particular place; otherwise, it violates the First Amendment. *Mahoney*, *Blue Mountain*, and *Layshock* could not be clearer. If there is to be punishment (which H.K. received from his parents), such falls to the parents and not school officials in *loco parentis*. Here, Defendants have failed to meet their burden. In fact, they purposely tried to hide from the facts confirming their theory fails. As such, summary judgment is not warranted in their favor for the failure to show entitlement to judgment as a matter of law. The motion should be denied.

### Void for Vagueness

As part of their motion for summary judgment, Defendants also sought summary judgment on the void for vagueness claim. The argument fails.

Rule 10's "gross misbehavior" is unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997); *Smith v. Mt. Pleasant Pub. Schs.*, 285 F. Supp. 2d 987 (E.D. Mich. 2003). That matter is fully briefed as part of **ECF Nos. 40, 45, and 47**.

### RELIEF REQUEST

WHEREFORE, the Court deny the motion for summary judgment as sought by Defendants.

Date: May 13, 2022

RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
**OUTSIDE LEGAL COUNSEL PLC**
**PHILIP L. ELLISON (P74117)**
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

**MATTHEW E. GRONDA** (P73693)
PO Box 70
St. Charles, MI 48655
(989) 249-0350
matt@matthewgronda.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on date stated below, I filed the foregoing document with the ECF/CM system which will serve an email copy of the same to all counsel of record (at their email address of record) on the date stated below.

Date: May 13, 2022                    RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
**OUTSIDE LEGAL COUNSEL PLC**
**PHILIP L. ELLISON (P74117)**
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

Counsel for Plaintiff