UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jason Kutchinski
as parent and next friend to H.K., a minor,

      Plaintiff,

v.                                Case No.: 1:19-cv-13810

Freeland Community School District, *et al.*,      Honorable Sean F. Cox

      Defendants.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Jason Kutchinski ("Kutchinski") initiated this action on behalf of his child, H.K. who is a student at Defendant, Freeland Community School District ("FCSD"). Kutchinski alleges that Defendants violated H.K's First Amendment and Due Process rights. (ECF No. 12).

There are two matters currently before the Court: (1) Defendants' motion for summary judgment brought pursuant to FED. R. CIV. P. 56 (ECF Nos. 37, 43) and (2) Kutchinski's motion for partial summary judgment as to Count II brought pursuant to FED. R. CIV. P. 56 (ECF No. 40). The motions have been fully briefed and a hearing was held on July 28, 2022. For the reasons set forth below, the Court:

    (1) **GRANTS** Defendants' motion for summary judgment (ECF Nos. 37, 43);

    (2) **DENIES** Kutchinski's motion for partial summary judgment (ECF No. 40); and

    (3) **DISMISSES** this action with prejudice.

1

**BACKGROUND**

Kutchinski commenced this action on December 30, 2019. (ECF No. 1). On March 4, 2020, Kutchinski filed an amended complaint. (ECF No. 12). As such the pleading superseded and replaced the original complaint.

The Defendants in this case are: (1) FCSD, (2) Matthew A. Cairy ("Cairy") – the superintendent of FCSD, in both his official and individual capacity, and (3) Traci L. Smith ("Principal Smith") – the high school principal at FCSD, in both her official and individual capacity (collectively "Defendants"). (ECF No. 12, at PageID 150).

In his Amended Complaint, Kutchinski alleges "First Amendment Violations" (Count I) and "Void for Vagueness/Overbreadth 42 U.S.C. § 1983" (Count II). (ECF No. 12, at PageID 165-169).

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order and provide, consistent with FED. R. CIV. P. 56 (c) that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 3).

For Defendants' motion, Defendants complied with the Court's practice guidelines for summary judgment motions and filed "Defendants' Statement of Material Facts Not In Dispute" (ECF No. 56). Kutchinski also complied with the Court's practice guidelines and filed a "Counter-statement Of Material Facts Not In Dispute" (ECF No. 60).

For Kutchinski's motion, Kutchinski complied with the Court's practice guidelines for summary judgment motions and filed a "Statement of Material Facts Not In Dispute As To Plaintiff's Motion for Partial Summary Judgment" (ECF No. 57). Defendants also complied with the Court's practice guidelines and filed a "Counter Statement of Material Facts Not In Dispute as to Plaintiff's Motion for Partial Summary Judgment" (ECF No. 59).

In May of 2019, H.K. was a 14-year-old student at Freeland High School, and his biology teacher was Mr. Steven M. Schmidt. (ECF No. 59, at PageID 1129).

In the early morning of Saturday, May 11, 2019, H.K. was at home, and he created an Instagram account impersonating Mr. Schmidt. (ECF No. 49-5, at PageID 958; ECF No. 51-16, at PageID 1063). H.K. set up the account, which bore the username, "schmidtmsteven"[1] and contained a profile picture of Mr. Schmidt that H.K. took from Mr. Schmidt's Facebook page. (ECF No. 49-5, at PageID 958). H.K. also authored what the parties refer to as the "Gas Pump Post" – a photograph of a gasoline pump nozzle having an embedded hypodermic needle, with a written comment below the photograph saying, "Watch out guys, I am concerned for everyone's safety." (ECF No. 59, at PageID 1129). H.K. was also at home when he made the Gas Pump Post. (ECF No. 51-16, at PageID 1063).

---

[1] In Kutchinski's brief, counsel argues that the name associated with the account was "Abdul Rashid."(ECF No. 51, at PageID 973). According to Instagram Business Records, the name on the account was Abdul Rashid, but the profile displayed the name Steven Schmidt. (ECF No. 51-12; ECF No. 51-3, at PageID 1001).

H.K. told the Tittabawassee Township Police Department that he was "playing online games with his friends [K.L. and L.F.] where they could talk to each other while they were playing. H.K. told K.L. and L.F. about the account and then he provided them with the username and password so they could both access the account." (ECF No. 51-16, at PageID 1063).

The account displayed the following on the cover page accompanied by a profile picture of Mr. Schmidt:

> Steven Schmidt
> Biology teacher at Freeland High School
> 1 Loving Wife #lovers married in 2016
> Father of 2 beautiful twins #blessed and 1 girl
> #growingup

(ECF No. 51-3, at PageID 1001). H.K. told the Tittabawassee Township Police Department that he did not know who added this personal information to the cover page. (ECF No. 51-16, at PageID 1063).

Over the course of the weekend, K.L. and L.F. made a series of posts on the account, some of which contained violent and sexually harassing content regarding current and former teachers and students at Freeland High School, including H.K., K.L., and L.F.'s English teacher, Chelsea Howson ("Mrs. Howson"), a substitute teacher/football coach, Trey Anderson ("Mr. Anderson"), and an unnamed cognitively impaired student. (ECF No. 60, at PageID 1135). The Tittabawassee Police Department described the posts authored by K.L. and L.F. in their report as follows:

> 3 – picture of another student with the caption "Glad this sicko is out of our school #assault #blessed
>
> 4 – picture of Steven Schmidt with his wife and child with the caption "Just #gangbanged my wife with 4 other men in the back of Arby's #notmykid #14inches"

> 5 – picture of another female teacher, Chelsea Howson, with the caption "Best sex in Pet Smart #throbbing #14inches #raw" (Believed to insinuate affair between teachers)
>
> 6 – video of an unknown female giving oral sex with the caption "Might have to cheat on my wife #big #14inches"
>
> 7 – picture of teacher Trey Anderson with two unknown students. Caption reads "I will find and kill @treyanderson – im going to strangle him with my barehands until he is barely conscious, then let go. Once he is awake im gonna run him over with my fucking car and crush his skull into a million pieces #lol @elite_edge
>
> 8 – picture of teacher Trey Anderson with his cat. Caption reads "I could beat up @treyanderson and anyone else in @elite_edge and then curb stomp his cat #gains@peta

(ECF No. 51-16, at PageID 1060) (*See also* ECF No. 51-3).

Mrs. Howson and Mr. Anderson were tagged in the posts that referenced them. (*See* ECF No. 51-3).

H.K. told the Tittabawassee Township Police Department that K.L. "kept telling [H.K.] when he was posting pictures on the account and [H.K.] monitored the account and saw what was being posted." (ECF No. 51-16, at PageID 1063). H.K. set up the account to be private, so only accounts accepted as followers could view it. (ECF No. 43-5, at PageID 736). The account had 22 followers, and H.K., K.L., and L.F. all had the power to accept follow requests. (ECF No. 43-5, at PageID 737). H.K. did not recall specifically authorizing any follow requests, but he admitted that it was possible that he had done so. (ECF No. 43-5, at PageID 737).

In the early morning of Sunday, May 12, 2019, Mr. Schmidt received an email from a student that alerted him to the account. (ECF No. 43-7, at PageID 778). Mr. Schmidt emailed Principal Smith and said:

> Someone has set up an account and pretending to be me on Instagram. The posts they are making are highly inappropriate. I have attached screenshots of them as of

5

6:00am 5-12. I filed reports for impersonation, threats of violence, and harassment
on Instagram as well. If there is anything else I need to do, please let me know.

(ECF No. 51-2, at PageID 996). Mr. Schmidt was concerned that the account "was set up in a way

that made me believe that it could be me . . . it had my full name and accurate information, and my

actual pictures. There had been effort gone into it." (ECF No. 43-7, at PageID 779). Mr. Schmidt

testified that the photographs of him and his family had been taken from his Facebook page and

his wife's Facebook page. (ECF No. 43-7, at PageID 780).

On that same day, Mrs. Howson was tagged in one of the posts that contained her picture

with the caption "Best sex in a Pet Smart #big #throbbing #14inches #raw[.]" (ECF No. 43-8, at

PageID 812; ECF No. 51-3, at PageID 998). This alerted Mrs. Howson to the account, and she

screenshotted the post and emailed Mr. Schmidt to inform him that he had been the target of a fake

Instagram account. (ECF No. 43-8, at PageID 812). Mrs. Howson also contacted Principal Smith

and reported the account on Instagram. (ECF No. 43-8, at PageID 812).

On Monday, May 13, 2019, Principal Smith launched an investigation into the account,

which was still active in the morning on when school began. (ECF No. 60, at PageID 1136).

Principal Smith described her investigation as follows:

Q. All right. What did your investigation consist of?

A. Well, it consisted of me calling multiple students out of the classroom, - -

Q. Okay.

A. - - trying to identify if they knew anyone who had made the account, anyone
who had posted to this account. It included talking with teachers who were alerting
me that there were many classroom disruptions going on in their rooms because
these kids were trying to take out their phones and show other kids in the classroom
what they were seeing, and they were pointing at the teachers, laughing. And then,
like I said, contacting the police, because I needed them to contact Instagram

because I do not have the authority to investigate things like an IP address or where
this originated from. So it consisted of all of those things.

(ECF No. 43-3, at PageID 694).

During first hour, Mr. Schmidt was approached by two students asking about the account.

(ECF No. 43-7, at PageID 782). Mr. Schmidt testified that the account impacted his teaching on

that day. (ECF No. 43-7, at PageID 783).

> A. I mean, to be fair, the whole first day back from work was really difficult. Like
> I'd mentioned, the posts were, you know, very like sexually explicit and said some
> pretty hurtful things, you know. And I had suspected it was probably a student,
> given the fact that there were other teachers at the school, and their grade level and
> their coaching level involved.
>
> So it was hard going and trying to make sure I was doing my best in front
> of students that have been the ones that were probably doing this to me in front of
> – on social media. I mean, it was tough getting – just being in the right head space
> to show up for work.
>
> Q. Well - -
>
> A. And then right when I started class, thinking maybe we can just make this a
> normal day. That's why I remember the first hour event so much is like, I thought
> I'm going to be able to get through today without worrying about it, and it's going
> to be fine. And then the two kids approached me, and it was like it kind of threw
> me off for the rest of the day from there.
>
> . . .
>
> A. I mean, teaching is highly personal. After being confronted I was less likely to
> engage with students out of fear that they were going to try to bring it up too. I was
> more likely to just kind of let things slide.
>
> Like normally I try to be very proactive in answering questions, I needed to
> kind of just get through. So, I mean, really that was what I - -

(ECF No. 43-7, at PageID 783-784). Mr. Schmidt tried to avoid conversations with students about

the Instagram account all day. (ECF No. 43-7, at PageID 784). During the sixth period, two

students were pulled out of class and "students were asking about where these two students were,

7

like kind of jokingly, like everybody knew what was going on kind of thing, but [Mr. Schmidt] didn't know what was going on." (ECF No. 43-7, at PageID 785). Throughout the day, students in Mr. Schmidt's biology classes "were talking about stuff that wasn't bio[.]" (ECF No. 43-7, at PageID 787).

During the lunch hour on Monday, May 13, 2019, H.K. had a conversation about deleting the Instagram account because it was getting out of control. (ECF No. 43-5, at PageID 737). H.K. deleted the account from his cell phone in the lunchroom a few minutes after this discussion. (ECF No. 43-5, at PageID 737).

Mrs. Howson testified that "students were whispering about the incident, mainly in the afternoon after it had sort of, in my experience, as it had sort of spread around." (ECF No. 43-8, at PageID 813). Mrs. Howson testified that there was a commotion in her fifth period, freshman, English class. (ECF No. 43-8, at PageID 814).

> A. I, from what I remember, observed, like I said [] from what I remember we were studying Romeo and Juliet, and they were in groups, seated in their desks in groups.
> And [L.F.] was talking to his group about the incident. I - - they were kind of gossiping, looking at me, looking back at [L.F.]. It was obvious what they were discussing.

(ECF No. 43-8, at PageID 814). Mrs. Howson told the students to get back on task and "they got back to their work, but they were still kind of having the conversation because I didn't explicitly ask them to stop talking about that topic." (ECF No. 43-8, at PageID 814-815). Mrs. Howson testified that she "felt incredibly humiliated the entire day" and that she "knew the students knew about it, and [she] was humiliated to even bring the topic up." (ECF No. 43-8, at PageID 815). Mrs. Howson felt "like [she] was a target that day" and that she "was just completely consumed

by anxiety." (ECF No. 43-8, at PageID 815). When Plaintiff's counsel asked Mrs. Howson if she

was being overly sensitive, Mrs. Howson testified:

> A. No, I don't think so at all. I think, actually as a female educator it was even more sever just because of the way different things in the news have come across with female teachers and accusations.
>
> The previous teacher, to my knowledge, that had held the position before we had an – had an incident with a student, and I just felt like there would be assumptions made about my character over which I had no control. Things spread very quickly, and people who didn't know me or weren't familiar enough with me would make assumptions about my character and what I would do and where the source of that post may have come from.
>
> Why would the student think to make that post? What gave the student the feeling that that was okay? And then to deal with, well, what do people think of the post? All of which stemmed from the account itself, which hadn't been created, it would have never happened.

(ECF No. 43-8, at PageID 819). Mrs. Howson's emotions built up throughout the day, and she was

brought to tears in the afternoon. (ECF No. 43-8, at PageID 822).

Mrs. Howson further testified that the account impacted her teaching. (*See* ECF No. 43-8).

Specifically, she testified that: "[she] wouldn't say the tasks that needed to be accomplished were

fully accomplished that day in the time period that [she] had allotted." (ECF No. 43-8, at PageID

817). She did not remember which specific tasks were not fulfilled, but after 11 years of teaching

experience, "[she knew] how long activities take, and any kind of deviation from the time can sort

of put us into the next day" and "[she knows] that disruptions where students aren't on task,

logistically speaking, take away from the time that is allotted to complete a task." (ECF No. 43-

8).

A student approached Miss Carrie Wheatley ("Miss Wheatley") because Mrs. Howson was

upset and crying in English class because of what was posted about her on the Instagram account.

(ECF No. 43-9, at PageID 844). Miss Wheatley told the student to report it to Principal Smith. (ECF No. 43-9, at PageID 844).

Principal Smith talked to many students throughout the day, and one of them identified H.K., K.L., and L.F. as being involved with the Instagram account. (ECF No. 43-3, at PageID 697). After Principal Smith identified H.K., K.L., and L.F., all three students were placed on an immediate five-day suspension pending further review. (ECF No. 60, at PageID 1138).

Principal Smith sought the expulsion of H.K. from Freeland Schools in May 2019. (ECF No. 59, at PageID 1130). On August 6, 2019, H.K. was given an administrative hearing before Superintendent Cairy, acting as the hearing officer on behalf of FCSD. (ECF No. 59, at PageID 1130). Superintendent Cairy ultimately gave H.K. a ten-day suspension for his conduct. (ECF No. 60, at PageID 1138). In Superintendent Cairy's letter informing H.K.'s parents of the outcome of the hearing, he wrote that:

> [H.K.] has received a ten (10) day suspension for his actions on May 11-13, 2019, including: gross misbehavior for his posting a fake Instagram account impersonating a teacher (under an assumed name), posting to that account as the teacher, and sharing the username and password with other students.

(ECF No. 51-15, at PageID 1053).

## STANDARD OF REVIEW

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving

party].” *Anderson*, 477 U.S. at 252. The Court “must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party.” *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002).

Further, “[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . .” *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir.2008). “In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true . . . .” *Id*. (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

## ANALYSIS

### I. First Amendment (Count I)

In Count I, Kutchinski alleges that the “actions and resulting punishment of H.K. for his off-campus parody profile of Steven M. Schmidt by each Defendant violates H.K.’s rights under the First Amendment[.]” (ECF No. 12, at PageID 165-166).

The First Amendment to the United States Constitution provides that “Congress shall make no law . . . abridging the freedom of speech.” U.S. Const. amend. I. The First Amendment promises that “the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.” *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). However, the Supreme Court has long recognized that federal and state officials may regulate, or even prohibit, certain types of speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Content-based restrictions on speech have been permitted for a few historic categories of speech, including incitement, obscenity, defamation, speech integral to criminal conduct, so-called ‘fighting words,’

child pornography, fraud, true threats, and speech presenting some grave and imminent threat the Government has the power to prevent. *U.S. v. Alvarez*, 567 U.S. 709, 717 (2012).

**A. Student Speech**

The Supreme Court has repeatedly made clear that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.' " *Mahanoy Area School District v. B.L. ex rel. Levy*, 141 S.Ct. 2038, 2044 (2021) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)). However, courts must apply the First Amendment "in light of the special characteristics of the school environment." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1998).

The Supreme Court has outlined three categories of student speech that schools may regulate in certain circumstances: "(1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing imprimatur of the school, such as that appearing in a school-sponsored newspaper." *Mahanoy*, 141 S.Ct. at 2045 (citing *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986); *Morse v. Frederick*, 551 U.S. 393, 409 (2007); and *Kuhlmeier*, 484 U.S. at 271). Finally, in *Tinker*, the Supreme Court said that schools have a special interest in regulating "speech that materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. at 513.

In regulating student speech, the school "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id*. at 509. The *Tinker* court concluded that students wearing black armbands in protest against the Vietnam War was passive and did not create "disorder or

12

disturbance" and therefore did not interfere with the school's work or collide with other students' rights "to be secure and to be let alone." *Id*. at 508.

**B. Off-Campus Speech**

Until the recent *Mahanoy* case, there was dispute among the lower courts as to whether schools may regulate off-campus speech. 141 S.Ct. at 2045. However, in *Mahanoy*, the Supreme Court made clear that the "school's regulatory interests remain significant in some off-campus circumstances." *Id*.

In *Mahanoy*, the Supreme Court held that the special characteristics that give schools additional license to regulate student speech do not "always disappear when a school regulates speech that takes place off-campus." 141 S.Ct. at 2045. The *Mahanoy* court listed several types of off-campus behavior that may call for school regulation, including "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students[.]" *Id*.

The Supreme Court in *Mahanoy* declined to set forth a broad rule governing the issue of when a school may regulate off-campus speech, but it provided three features that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway." *Id*. The first feature is that a school will rarely stand *in loco parentis* (standing in the place of the students' parents) in relation to off-campus speech. *Id*. at 2046. The second feature is that "regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day." *Id*.  The Supreme Court explained that this second feature means "courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Id*. The Court emphasized the importance of the second factor on political and

religious speech. Third, the Court stated that "the school itself has an interest in protecting a student's unpopular expression" because "schools are the nurseries of democracy." *Id*.

The student in *Mahanoy* was disciplined for off-campus Snapchat posts, which bore the caption: "fuck school fuck softball fuck cheer fuck everything." *Id*. at 2043. The Supreme Court characterized her speech as "criticism of the rules of a community" and noted that she "did not identify the school in her posts or target any member of the school community with vulgar or abusive language." *Id*. at 2047. The Supreme Court balanced the features of her off-campus speech with the school's interest, which was "primarily an interest in prohibiting students from using vulgar language to criticize a school team or its coaches[,]" and found that that it was insufficient to overcome the student's interest in free expression. *Id*. The *Mahanoy* court further concluded that the five to ten minutes of Algebra class spent discussing the post and the upset of some members of the cheerleading team was insufficient to satisfy the "material disruption" prong of *Tinker*. *Id*.

Therefore, under *Mahanoy*, the Court must balance the school's interest in disciplining a student's speech against the off-campus features of his speech and then address the "material disruption" prong of *Tinker*.

As an initial matter, the Court finds that H.K's creation of and subsequent involvement with the Instagram account is off-campus speech, and therefore the Court shall follow the analysis in *Mahanoy*. In Defendants' motion for summary judgment, they make a brief argument that H.K's speech should be considered on-campus speech because H.K deleted the account while in the school lunchroom. (ECF No. 43, at PageID 652). The standard for regulating on-campus speech is less stringent because while a student is at school, the school stands *in loco parentis*, "treating

school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy*, 141 S.Ct. at 2046. However, the parties do not dispute that H.K. created the account and shared the username and password with his friends, while at his personal residence, using a personal device outside of school hours. (ECF No. 51-16, at PageID 1063). H.K. told the Tittabawassee Township Police Department that he was home all weekend. (ECF No. 51-16, at PageID 1063). H.K. deleted the account at lunch on Monday, so the account was only active for a few hours during school hours. Thus, the majority of H.K.'s speech occurred off-campus, on a personal device, over the weekend, at his home. As such, the Court will address H.K.'s actions as off-campus speech and follow the analysis in *Mahanoy*.

## C. H.K.'s Speech

The Court must consider several issues regarding H.K.'s speech. Under *Mahanoy*, the Court must balance Defendants' interest in disciplining H.K. for the Instagram account against the off-campus features of his speech. 141 S.Ct. at 2045. The Court must also consider whether H.K. can be disciplined for K.L. and L.F.'s posts on the Instagram account. Finally, under *Tinker*, the Court must analyze whether there was a material disruption or whether school officials reasonably foresaw that the Instagram account would cause a substantial disruption at the school before they punished him. *See LaVine v. Blaine School District*, 257 F.3d 981, 989 (9th Cir. 2001).

### i. Balancing Test under Mahanoy

Defendants argue that they have "a special interest in regulating speech that constituted targeted and threatening harassment of full-time and part-time faculty, explicit threats made toward

a faculty member,[2] and sexual harassment of educators and their families." (ECF No. 43, at PageID 652).

The posts made in the "schmidtmsteven" Instagram account directly aligns with the types of behavior that the *Mahanoy* court listed that may call for school regulation, specifically "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students[.]" *See* 141 S.Ct. at 2045. The account specifically targeted and harassed a former unnamed student and three teachers at H.K.'s school: Mr. Schmidt, Mrs. Howson, and Mr. Anderson. (*See* ECF No. 51-3).

*Mr. Schmidt.* The Instagram account impersonated Mr. Schmidt with great detail. It contained his full name, identified his occupation as a biology teacher at Freeland High School, identified his wife and children, and included real pictures of him and his family. (*See* ECF No. 51-3). In Mr. Schmidt's words, the account "was set up in a way that made me believe that it could be me." (ECF No. 43-7, at PageID 779). The Instagram account made it look like Mr. Schmidt was "gangbanging" his wife, having a sexual affair with Mrs. Howson, and threatening to kill Mr. Anderson. (*See* ECF No. 51-3). Mr. Schmidt was concerned that people would think it was his actual Instagram account, and he testified "teacher perception is really important. So [he tries] to control the things that are available online. And [he] wanted people to know [the Instagram account] was not [him]." (ECF No. 43-7, at PageID 779). Mr. Schmidt testified that he was "pretty distraught" over the Instagram account. (ECF No. 43-7, at PageID 781).

---

[2] The Court notes that Defendants do not argue that H.K.'s speech constituted a "true threat" exception to free speech protections. *See J.S. ex rel M.S. and D.S. v. Manheim Township School District*, 263 A.3d 295 (2021).

16

*Mr. Anderson*. The account targeted and threatened Mr. Anderson, who in May 2019 was a substitute teacher and a football coach. (ECF No. 37-3, at PageID 434). One of the posts included a picture of Mr. Anderson with his cat with the caption, "I could beat up @_treyanderson_ and anyone else in @elite_edge and then curb stomp his cat. #gains @peta" (ECF No. 51-3, at PageID 997). One of the posts included a picture of Mr. Anderson with two unknown students with the caption "I will find and kill @_treyanderson_ im going to strangle him with my barehands until he is barely conscious, then let go. Once he is awake again im gonna run him over with my fucking car and crush [his] skull into a million pieces. #lol @elite_edge" (ECF NO. 51-3, at PageID 1003). During H.K.'s interview with the Tittabawassee Police Department, H.K. "explained that this elite edge is a group of guys that work out with Teacher Trey Anderson" and he believed that K.L. and L.F. "belong to Teacher Trey Anderson[']s work out club elite edge." (ECF No. 51-16, at PageID 1063).

*Mrs. Howson*. The account targeted and sexually harassed Mrs. Howson, who in May 2019 was H.K., L.F., and K.L.'s English teacher. (ECF No. 37-3, at PageID 434). One of the posts included a picture of her face, with the caption "Best sex in a Pet Smart #throbbing #14inches #raw[.]" (ECF No. 51-3, at PageID 998). The account humiliated Mrs. Howson and caused her to become a target of the students' gossip. (*See* ECF No. 43-8, at PageID 814-822). She was consumed with anxiety, and eventually, she was brought to tears during class time. (*See* ECF No. 43-8, at PageID 814-822).

*Unnamed Student*. The account targeted and harassed an unnamed, former Freeland High School student, who is a "cognitively impaired student" according to Principal Smith. The caption

underneath the student's picture stated, "Glad this sicko is out of our school #assault #Blessed[.]" (ECF No. 51-3, at PageID 1004; ECF No. 37-3, at PageID 438).

In light of the highly targeted nature of the threats and harassment on the account, it certainly qualifies as "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students," and Defendants have a significant interest in regulating this type of off-campus speech. *Mahanoy*, 141 S.Ct. at 2045.

In regard to the off-campus nature of the speech, Defendants did not stand *in loco parentis* while H.K. created the account at home. However, H.K.'s speech was not political or religious in nature, nor is it merely an "unpopular opinion" that should be protected. *See Mahanoy*, 141 S.Ct. at 2046. Instead, the Instagram account targeted, threatened, and harassed specific teachers and a student. As such, the Court finds that the off-campus nature of H.K's speech does not outweigh Defendants' interest in protecting its staff and students from such severe, specifically targeted harassment and threats.

*ii. Online Group Bullying*

Kutchinski argues that he should not be punished for the posts made by K.L. and L.F. and cites to the Communications Decency Act, 47 U.S.C. § 230(C)(1). (ECF No. 51, at PageID 989-990). However, this statute is inapplicable. "Section 230 of the CDA 'immunizes providers of interactive computer services against liability arising from content created by third parties.'" *Gonzalez v. Google LLC*, 2 F.4th 871, 886 (9th Cir. 2021). The provision cited by Kutchinski states, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 further provides that "[n]o cause of action may be brought and no liability

may be imposed under any State or local law that is inconsistent with this section." *Id*. § 230(e)(3). Section 230 thus provides immunity from civil lawsuits, and H.K. is not being sued for his speech or conduct. Rather, H.K. is a minor student who was disciplined by his school for his off-campus speech who is now bringing his own suit against the school. As such, Section 230 is inapplicable to this matter.

Moreover, while the Sixth Circuit has not yet addressed the issue, other circuit courts around the country have held that a school can punish a student for participating in online group bullying, even where the disciplined student may not have been the main offender.

In *Doe v. Hopkinton Public Schools*, 19 F.4th 493, 505 (1st Cir. 2021), the disciplined students were members of a Snapchat group conversation that bullied a fellow student. Similar to Kutchinski, the students argued that they did not engage in the offending conduct and therefore their punishment violated the First Amendment. *Id*. at 506. The First Circuit analyzed whether there was a causal connection between the students' speech and the bullying that invaded the other students' rights. *Id*. at 506-507. The *Hopkinton* court held that the school did not violate students' First Amendment rights and stated: "Children often bully as a group. The children who stand on the sidewalk and cheer as one of their friends shakes down a smaller student for his lunch money may not be as culpable, but they are not entirely blameless." *Id*. at 507. The *Hopkinton* court noted that the school reasonably concluded that the students' "messages and participation in the group fostered an environment that emboldened the bullies and encouraged others in the invasion of [the bullied student's] rights." *Id*. at 508.

In *Kowalski v. Berkley County Schools*, 652 F.3d 565 (4th Cir. 2011), the disciplined student created and posted to a MySpace page, which was dedicated to ridiculing a fellow student.

*Id*. at 567. Other students posted comments and photographs of the bullied student. *Id*. at 568. The Fourth Circuit concluded that the MySpace page that the student created "functioned as a platform for [the disciplined student] and her friends to direct verbal attacks towards classmate" and held that "the school was authorized to discipline [the student] because her speech interfered with the work and discipline of the school." *Id*. at 572-574.

It is also not unprecedented for a school to punish a student who disparaged educators online. In *Doninger v. Niehooff*, 527 F.3d 41, 45 (2nd Cir. 2008), the disciplined student, who was on the Student Council, wrote a blog post disseminating misleading information about a school event, called school administrators "douchebags," and encouraged her fellow students to try and "piss off" the school administrator more. *Id*. Several other students posted comments on her blog post, one of which called the school administrator a "dirty whore." *Id*. The Second Circuit reasoned that the student's "conduct posed a substantial risk that LMHS administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate misguided anger or confusion" and ultimately held that the school did not violate the student's First Amendment rights by disciplining her. *Id*. at 51-52.

Here, just as in *Kowalski*, H.K. created the Instagram account that functioned as the online platform through which K.L. and L.F. made the harassing posts. *See Kowalski*, 652 F.3d at 572. H.K. was the one who set up the account to impersonate Mr. Schmidt. (ECF No. 49-5, at PageID 958). H.K. took a picture from Mr. Schmidt's personal Facebook page to make the account look more like it was Mr. Schmidt. (ECF No. 49-5, at PageID 958). H.K. knew his friends were publishing the harassing posts and he retained control over who could follow the account. (ECF No. 51-16, at PageID 1063). Just as in *Hopkinton*, H.K's actions "fostered an environment that

emboldened the bullies." *See* 19 F. 4th at 506-507. This demonstrates a clear causal connection between H.K.'s speech and the harassment that invaded the rights of Mr. Schmidt, Mr. Anderson, Mrs. Howson, and the former cognitively impaired student. *See Hopkinton*, F.4th at 506-507. As such, the Court finds that the school could discipline H.K. for his involvement with the Instagram account.

*iii. Material Disruption under Tinker*

Kutchinski also argues that there was no material disruption or substantial disorder under *Tinker*. (ECF No. 51, at PageID 989). However, "this argument is misguided insofar that it implies that *Tinker* requires a showing of actual disruption to justify a restraint on student speech." *Doninger*, 527 F.3d at 50. As the Sixth Circuit has stated, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007). "Forecasting disruption is unmistakably difficult to do. *Tinker* does not require a certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption." *LaVine*, 257 F.3d at 989.

In support of his argument, Kutchinski directs the Court to *J.S. ex rel Snyder v. Blue Mountain School District*, 650 F.3d 915 (3rd Cir. 2011), which held that a school violated a student's First Amendment rights by disciplining her for creating a MySpace profile impersonating her principal (but it did not contain his name, school, or location) on her home computer. The Third Circuit noted that "the record indicates that the profile was so outrageous that no one took the content seriously." *Id*. at 921. The Third Circuit came to this conclusion largely because the MySpace profile was off-campus speech and the school "rumblings" over the matter

21

did not cause a substantial disruption. *Id*. at 933 ("Neither the Supreme Court nor this Court has ever allowed schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school. We follow the logic and letter of these cases . . . ").

The present case is distinguishable from *Blue Mountain* in several ways. First and foremost, the Third Circuit decided *Blue Mountain* long before the Supreme Court in *Mahanoy* held that schools can regulate off-campus speech in certain circumstances. And again, here, the Instagram account falls within two of the specific categories of off-speech that the *Mahanoy* court said a school would have a significant interest in regulating: "serious or severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students." *Mahanoy*, 141 S.Ct. at 2045. Furthermore, unlike in *Blue Mountain*, here, the record indicates that students and faculty took the "schmidtmsteven" Instagram account seriously. The account listed Mr. Schmidt by name, included pictures of himself and his family, identified his position at Freeland High School, and specifically targeted other teachers with sexual harassment and threats of physical violence. (*See* ECF No. 51-3). Once it was discovered, Mr. Schmidt and Mrs. Howson reported it to Principal Smith and Instagram. (ECF No. 43-7, at PageID 780; ECF No. 43-8, at PageID 812) Several students approached Mr. Schmidt about the account, indicating that they may have believed it was his account. (*See* ECF No. 43-7, at PageID 778-782). Whereas in *Blue Mountain*, the MySpace profile did not provide the principle's name, school, or location nor did it specifically target other people. Here, the "schmidtmsteven" Instagram account was taken seriously by Freeland High School staff and students because it included so much personal identifiable

information about Mr. Schmidt and specifically targeted the other teachers and the unnamed student.

Kutchinksi also directs the Court to the recently decided Tenth Circuit opinion: *C1.G on behalf of C.G. v. Siegfried*, 38 F.4th 1270 (10th Cir. 2022). However, the reasoning in *Siegfried* does not help him. In *Siegfried*, a student was off-campus at a thrift store with friends, and he found a hat that "resembled a foreign military hat from the World War II period." *Id*. at 1274. Then the student took a picture of his friends wearing a collection of hats and wigs, including the WWII hat. *Id*. The student posted the picture to his private Snapchat story with the caption, "Me and the boys bout [sic] to exterminate the Jews." *Id*. The student removed the post after a few hours and apologized for the picture saying, "it was ment [sic] to be a joke." *Id*. The school eventually expelled the student for the post. *Id*. at 1275. The Tenth Circuit held that the plaintiff had properly alleged that the school violated his First Amendment rights and affirmed the district court's decision denying a motion to dismiss. *Id*. at 1279. In determining that there was no reasonable forecast of substantial disruption under *Tinker*, the Tenth Circuit specifically reasoned, "C.G.'s post did not include weapons, specific threats, or speech directed toward the school or its students." *Id*. The Tenth Circuit distinguished the plaintiff's speech from other cases where courts found a substantial disruption under *Tinker*, and it noted that "those cases all addressed specific threats directed at a school, its students, or its officials." *Id*.

Here, the Instagram account specifically targeted three teachers and another student. The Instagram account so realistically impersonated Mr. Schmidt that he was concerned people would think it was his account. (ECF No. 43-7, at PageID 779). It contained real pictures of Mr. Schmidt, Mr. Schmidt's wife and children, Mrs. Howson, Mr. Anderson, and other students. (*See* ECF No.

51-3). The Instagram account made it look like Mr. Schmidt was having a sexual affair with Mrs. Howson and threatening to kill Mr. Anderson. (*See* ECF No. 51-3). The account even went so far as to tag Mrs. Howson and Mr. Anderson's actual Instagram accounts in the posts referencing them. (*See* ECF No. 51-3). It also tagged a workout club, in which FCSD students worked out with Mr. Anderson. (ECF No. 51-16, at PageID 1063). In short, the Instagram account and its content appeared legitimate to an outside viewer because it contained so much of Mr. Schmidt's personal identifiable information and real pictures of Mr. Schmidt, Mr. Schmidt's family, Mrs. Howson, Mr. Anderson, and other Freeland High School students.

This legitimate-looking account was still active on Monday morning when school began. Students approached the teachers to ask about it, and students were gossiping about it when they should have been doing schoolwork. (*See* ECF Nos. 43-3, 43-7, 43-8, 43-9). The targeted teachers were so distressed that it impacted their ability to teach, and it made Mrs. Howson cry during class. (*See* ECF Nos. 43-3, 43-7, 43-8, 43-9). Furthermore, by lunchtime, the situation at Freeland High School had escalated such that H.K.'s friends advised him to delete the account. (ECF No. 43-5, at PageID 736). H.K. testified that he deleted the account because he "did not want anyone to get hurt[.]" (ECF No. 43-5, at PageID 736-737). Based upon the reaction of the students and teachers to the highly targeted nature of the account, it was reasonable for Principal Smith to forecast a substantial disruption under *Tinker*. As in *Doninger*, the Instagram account "posed a substantial risk that [Freeland High School] would be further diverted from their core educational responsibilities by the need to dissipate . . . confusion" surrounding the account. 527 F.3d at 51.

24

In conclusion on the First Amendment claim, the Court finds that Defendants did not violate H.K.'s right to free speech and GRANTS Defendants' motion for summary judgment as to Count I.

## II. Vagueness and Overbreadth (Count II)

Count II of Kutchinski's Amended Complaint is fashioned as "Void for Vagueness/Overbreadth 42 U.S.C. § 1983." (ECF No. 12, at PageID 167). In Count II, Kutchinski alleges that Rule 10 of the *General Rules and Recommendations* of the Freeland Middle/High School Student Handbook ("Rule 10"), "particularly the prohibition on 'gross misbehavior' is void for vagueness and invalid because of its overbreadth both facially and also as applied to H.K." (ECF No. 12, at PageID 168). Kutchinski further alleges that Rule 10 "leaves parents and students, including Plaintiff . . . 'in the dark' about what is demanded and thereby unconstitutionally allows school officials 'to make it up' as they go and cause (as done in this case) violations on First Amendment protections." (ECF No. 12, at PageID 169).

Rule 10 states: "Students guilty of gross misbehavior, persistent disobedience or having habits detrimental to the school will be suspended or excluded from Freeland Schools." (ECF No. 12-1, at PageID 187).

In Kuchinski's motion for partial summary judgment, he asks the Court to find that "gross misconduct" as provided in Rule 10 is void-for-vagueness. (ECF No. 40, at PageID 620). In Defendants' motion for summary judgment, they argue that the Court should dismiss Count II because "H.K. was punished under multiple other rule violations, as well as Rule #10, and is therefore, a moot issue." (ECF No. 43, at PageID 655).

25

The formal suspension letter does not list any specific rules in its reasoning for why H.K. was suspended for 10 days. (ECF No. 12-7, at PageID 240). It merely states:

> [H.K.] has received a ten (10) day suspension for his actions on May 11-13, 2019, including: gross misbehavior for his posting a fake Instagram account impersonating a teacher (under an assumed name), posting to that account as the teacher, and sharing the username and password with other students.

(ECF No. 51-15, at PageID 1053). Therefore, Rule 10 could have been the basis for H.K.'s suspension, and the Court will address Kutchinski's argument as to whether Rule 10 is void-for-vagueness.

Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). "The overbreadth doctrine rests on the notion that "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech," a chilling effect that inhibits the free exchange of ideas." *Hopkinton*, 19 F.4th at 509 (citing *Williams*, 553 U.S. at 292). The void-for-vagueness doctrine is derived from the Due Process Clause of the Fifth Amendment and is concerned with circumstances in which a law is so vague that it does not provide fair notice of what conduct it prohibits and creates a risk of arbitrary enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). Courts have long recognized that when a vague law implicates First Amendment interests, the injuries can be similar to and overlapping with those in overbreadth claims, but the analysis takes place under distinct tests. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, (2010); *Vill. Of Hoffman Ests. V. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982).

26

**A. Overbreadth**

The overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). A law "is unconstitutionally overbroad when there exists a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir. 1998). "Under the traditional test for assessing restrictions on expressive conduct, a regulation (or in this case, a [school] policy) will be upheld if: '(1) it is unrelated to the suppression of expression, (2) it furthers an important or substantial government interest, and (3) it does not burden substantially more speech than necessary to further the interest.' " *Yoder v. University of Louisville*, 526 Fed.App'x 537, 547 (6th Cir. 2013) (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005). In attacking FCSD's policies, Kutchinski bears the burden of demonstrating that the policies reach a substantial amount of protected free speech, judged in relation to the policies' plainly legitimate sweep." *Id*. This is a high burden, and "the mere fact that one can conceive of some impermissible applications of a policy is not sufficient to render it susceptible to an overbreadth challenge." *Id*. (citing *Mems. of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

The parties do not substantively address the overbreadth doctrine in their briefing, but rather focus their arguments on vagueness. As such, Kutchinski has not met his high burden to demonstrate that the rule is overbroad.

**B. Vagueness**

Due process requires that this Court hold a statute, ordinance, or resolution void for vagueness "if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food*, 163 F.3d at 358-359.

While schools are required to provide students with some level of due process, "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship." *Bethel School Dist. No. 493 v. Fraser*, 478 U.S. 675, 686 (1986) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985)). Schools require this flexibility because "they need . . . to control such a wide range of disruptive behavior." *Sypniewski v. Warren Hills Reg'l Bd. Of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002). "In other words, 'the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Kowalski*, F.3d at 575 (quoting *Fraser*, 478 U.S. at 686).

Here, Rule 10 states that "students guilty of gross misbehavior, persistent disobedience or having habits detrimental to the school will be suspended or excluded from Freeland Schools." (ECF No. 12-1, at PageID 187). Rule 10 is one out of 25 "General Rules and Recommendations" for Student Conduct in a 27-page Handbook of full of guidance for students and their parents on everything from cafeteria rules to the attendance policy. (*See* ECF No. 12-1).

The thrust of Kutchinski's claim is that the term "gross misbehavior" is vague. The Court disagrees. The dictionary defines "gross" as "glaringly noticeable usually because of inexcusable badness or objectionableness[.]" *Gross*, Merriam-Webster, https://www.merriam-

28

webster.com/dictionary/gross (last visited June 30, 2022). The dictionary defines "misbehavior" as "bad, improper, or rude behavior: ill conduct" and "gravely deficient in civility or decency: crudely vulgar[.]" *Misbehavior*, Merriam-Webster, https://www.merriam-webster.com/dictionary/misbehavior  (last visited June 30, 2022). When read in the context of the school handbook, the phrase "gross misconduct" clearly means an egregious violation of school rules or other extremely bad behavior.

Relevant to Kutchinski's speech, Rule 9 – placed directly above Rule 10 – states that "[t]hreats or gross disrespect against any employee of the Freeland Schools will result in suspension and a possible recommendation for expulsion." (ECF No. 12-1, at PageID 187). The formal letter of suspension did not provide specific rules that H.K. violated. However, when Rules 9 and 10 are read together in the Student Handbook, they clearly provide students and parents "fair notice" that H.K's behavior would be subject to discipline up to expulsion.

Therefore, the Court finds that Rule 10 is not void-for-vagueness; DENIES Kutchinski's motion for partial summary judgment; and GRANTS Defendants' motion for summary judgment as to Count II.

## CONCLUSION

For the reasons explained above:

(1) Defendants' motion for summary judgment is **GRANTED** (ECF Nos. 37, 43);

(2) Kutchinski's motion for partial summary judgment is **DENIED** (ECF No. 40); and

(3) this action is **DISMISSED with prejudice**.

**IT IS SO ORDERED**.

Dated:  August 4, 2022                    s/Sean F. Cox
                                          Sean F. Cox
                                          United States District Judge

29